IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LAURA C. TAFOYA**,

      Plaintiff,

v.                                Case No. **CIV-05-462 MV/RHS**

**STATE OF NEW MEXICO CORRECTIONS
DEPARTMENT, CENTRAL NEW MEXICO
CORRECTIONAL FACILITY**,

      Defendant.

## MEMORANDUM OPINION and ORDER

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment,

[Docket No. 18, filed January 23, 2006]. After considering the parties' briefs, the summary

judgment record, and the relevant law, and otherwise being fully informed, the Court concludes

that the motion should be **GRANTED**.

Plaintiff Laura Tafoya brought this action under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000 et seq., seeking redress for gender discrimination and retaliation. She also

seeks compensation under state law for breach of contract. Mrs. Tafoya alleges that she applied

for a promotion to Quality Assurance ("QA") Manager at the Central New Mexico Correctional

Facility (CNMCF), for which she was highly qualified, but was denied the promotion. She alleges

that Defendant, through Warden Jose Romero, filled the position with a less-qualified male

applicant, Robert Tenorio, and that, after she complained, Defendant retaliated against her by

isolating her and failing to include her in meetings relevant to her job; by assigning a job

evaluation rating to her that was lower than evaluations she had received in prior years from

previous supervisors; by harassing her; and by advising her that she was expected to get CNMCF through an audit "and that if she doesn't there will be consequences." Pretrial Report at 3.  In her response brief Mrs. Tafoya also claims retaliation by creation of a hostile work environment.  In addition, Mrs. Tafoya claims that Defendant breached its employment contract with her by failing to (1) use proper processes in advertising, interviewing, and filling the QA Manager position, (2) implement proper scoring and interviewing procedures, (3)  properly open and close her employee evaluation, and (4) advise her of her job title and duties after her job was changed; and by (5) discriminating against her because of her gender, (6) refusing to give her temporary and permanent salary increases in 2002, and (7) refusing to reimburse her for travel costs in 2003 for a flight that she paid for and then canceled after her travel request was denied.  *See id*. at 4-5.

Defendant contends that the facts conclusively show that Mrs. Tafoya was not the most qualified applicant for the position; that she cannot establish that she would have received the promotion but for gender discrimination; and that she cannot establish pretext.  Defendant also argues that the acts Mrs. Tafoya alleges to be retaliatory are not adverse employment actions and do not constitute a hostile work environment.  Defendant asserts that Mrs. Tafoya cannot establish that Defendant breached any policies or that, if it did, that the alleged breaches led to contractual damages; that her claims related to requested pay increases in 2002 are barred by the two-year statute of limitations; that her claim for reimbursement is barred because the alleged promise to reimburse was not written; and that there is no evidence of a contractual obligation to pay any of the sums that Mrs. Tafoya alleges are due.

## I.  Applicable legal standards

To survive summary judgment, a plaintiff bringing a Title VII failure to hire

claim must first establish the four elements of a *prima facie* case of discrimination by showing that:

> (i) plaintiff belongs to a protected class; (ii) plaintiff applied and was qualified for a job for which the employer was seeking applicants; (iii) despite being qualified, the plaintiff was rejected; and (iv) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications.
>
> *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)) (internal quotation marks omitted).  Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for the contested action.  *Kendrick*, 220 F.3d at 1229-30. "[I]f a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual-i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial." *Id.* at 1230.

*Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321 (10th Cir. 2004).

In order to state a prima facie case of retaliation, Mrs. Tafoya must demonstrate that (1) she was engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.  *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004). Where, as here, there is no direct evidence of retaliation, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See id.* at 1070.  Thus, Mrs. Tafoya "must first present a prima facie case of retaliation, which then shifts the burden to [Defendant] to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." *Id.* at 1070-71. If Defendant satisfies its burden, Mrs. Tafoya must then provide evidence showing that the Defendant's proffered reasons are a pretext for discrimination. *Id.* at 1071.

3

Pretext may be demonstrated by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the reasons given for the employment action such that "a reasonable factfinder could rationally find them unworthy of credence." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1241 (10th Cir. 2004) (internal quotation marks omitted).  But mere conjecture that Defendant acted with discriminatory or retaliatory intent will not suffice to establish pretext. *See id.*  In assessing whether Mrs. Tafoya has made an appropriate showing of pretext, I must consider the evidence as a whole.  *See id.*  In addition, on the issue of discriminatory failure to promote, I must examine the facts as they appeared to the person making the promotion decision at the time it was made, *see Kendrick  v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000), because it is the employer's "perception . . . that is relevant, not [Mrs. Tafoya's] subjective evaluation of [her] own relative performance." *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1178 (10th Cir. 2000) (internal quotation marks omitted).  Further, I must keep in mind that assertions made in an affidavit that are not either corroborated in the record or based on personal knowledge "are insufficient to create a genuine question of material fact as to pretext" in the summary-judgment context.  *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004).  As I have previously noted, Tenth Circuit and Supreme Court precedent hold that

> [s]ummary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to secure the just, speedy and inexpensive determination of every action.  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the Court, viewing the record in the light most favorable to the non-moving party, determines that there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.
>
> The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the moving party meets this burden, Rule 56(e) requires the nonmoving party to go beyond the

> pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.
>
> Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's position. In such a situation, the moving party is entitled to judgment as a matter of law.

*Keller v. Bd. of Educ.*,182 F. Supp. 2d 1148, 1154 (D.N.M. 2001) (internal quotation marks and citations omitted). With these principles in mind, I turn to the whole summary judgment record, focusing on undisputed or stipulated facts. If facts are in dispute, I have viewed them in a light most favorable to Mrs. Tafoya.

## II.  Material facts

Mrs. Tafoya is a long-time employee of the New Mexico State Department of Corrections ("DOC") at its CNMCF facility. She had forty credit hours of college education, but did not finish her degree. After working her way up from being a secretary to becoming the Human Resources Administrator Supervisor at CNMCF over a period of twelve years, Mrs. Tafoya was asked in January 2002 by then-Warden Ron Lytle to also take on the major responsibilities of helping CNMCF to retain its American Correctional Association ("ACA") accreditation and to temporarily act as his executive assistant. *See* Pl. Resp. to MSJ Ex. B at 30. Having only eleven months to finish getting CNMCF ready for the audit, Mrs. Tafoya immediately jumped into the task, accumulating over 520 hours of comp time during the next eleven months. She revised policies, collected three years of documentation, and ensured that CNMCF was ready for the

audit.  *See id.*  During this time, her title was "Accreditation Manager," and acting "Executive Assistant," although she also technically retained her position as Human Resources Administrator Supervisor.  She cross-trained two human resources employees to carry "most of the load" of the human resources work during that time.  *See id.* at 31-32; Pl. Resp. to MSJ Ex. K at 5.

Mrs. Tafoya performed her accreditation duties extremely well, receiving the accolades of Warden Lytle and becoming well known for her expertise in ACA accreditation.  *See* Pl. Resp. to MSJ Ex. B at 30-31.  Mrs. Tafoya states that she, through Warden Lytle, orally requested a temporary pay increase in January 2002, and that it was orally denied around a month later.  *See* Def. MSJ Ex. B at 51-52.  In November 2002 Warden Lytle submitted a written request for the State to give Mrs. Tafoya a 10% permanent in-band salary increase because of her successful assumption of the accreditation manager duties and because of her excellent performance as the Human Resources Director.  *See*  Pl. Resp. to MSJ Ex. B at 45.  Mrs. Tafoya had been paid at 90.8% of the maximum wage; the new wage would place her at 99.9% of the wage scale.  *See id.* But the Human Resource Bureau Chief and Deputy Secretary of Administration denied the requests in November and again in February 2003.  *See* Pl. Resp. to MSJ Ex. K at 6.  According to Mrs. Tafoya, the administrators first cited budget constraints as the reason for the denial of the temporary pay increase and then stated that no permanent in-pay band adjustments would be approved because a new administration would be taking over in January 2003.  *See id.*  The second resubmission for a permanent increase, which was mailed directly to the newly-appointed Secretary of Corrections, was rejected.  Mrs. Tafoya states that she was later told that administrators rejected her request "because the paperwork was sent directly" to the new Secretary instead of through the proper channels.  *Id.*

6

In May 2003, Mrs. Tafoya was permanently promoted to her current position of Staff Manager-3310/Accreditation Manager. *See* Pl. Resp. to MSJ Ex. B at 1. While the standard wage increase for such a promotion was 10%, Warden Lytle requested a 22% increase. *See* Def. MSJ Ex. A at 4. The State Personnel Office granted a 15% pay increase. *See* Pl. Resp. to MSJ Ex. K at 7. In November 2003, Mrs. Tafoya and Warden Lytle petitioned the State to create a new position called "Quality Assurance Manager." The person in this position would "plan, organize, and direct" the quality assurance department and manage the support staff, including "the position Mrs. Tafoya occupied at the time [Staff Manager-3310], four Hearing Officers and a clerk." Def. MSJ, Ex. A at 8 (official job description), Complaint, Doc. 1 at 4. In addition, the new QA Manager would "[u]sually manage at least two programs" that were "components/initiative of broader program;" would supervise more than 9 employees and subordinate supervisors/managers; would be "[r]esponsible for budget implementation;" and would "[a]dminister statewide department or agency rules, regulations, and policies" as well as being responsible for policy development. Def. MSJ Ex. A at 7-8.

Warden Lytle was replaced by Warden Jose Romero in January 2004. The State approved the new QA position in July 2004, and many DOC employees, including Mrs. Tafoya and Mr. Tenorio, applied for the position. The job posting stated that a bachelor's degree was required, but neither Mrs. Tafoya nor Mr. Tenorio had completed their degrees and it turned out that inclusion of such a requirement was a clerical error.

Karen Herrera, who was a corrections administrator with the State's Children, Youth and Families juvenile justice division, also applied. Ms. Herrera had extensive experience in conducting ACA audits for the juvenile facilities since 1998 and in reviewing and constructing

files for ACA accreditation for the NM DOC between 1992 and 1998. Pl. Resp. to MSJ Ex. X at

5-6. She had eleven years of experience with the DOC in adult corrections as a classification

officer and supervisor and then as a corrections administrator, and also has a Bachelor of Science

Degree. *See id.*

Mr. Tenorio was serving the DOC as an administrative law judge at the time he applied

for the QA Manager position. He had almost twenty-four years of experience at correctional

facilities and training academies in New Mexico, including serving as the first full-time Director of

the Sandoval County Jail for eighteen months. As Director, he had supervised eighty-five

employees and was responsible for the budget and for the integrity of the county assets and

contracts. He began his career at the DOC by working as a farm foreman and then became a

security officer, a training coordinator, a recreation and security staff supervisor, a classification

officer, a hearing officer, and an administrative law judge. He had three years of college

education. He was the only applicant of the top three with hearing-officer experience.

The hiring process began in August 2004 and consisted of three steps. First, the State

Personnel Office independently ranked the candidates based on the written materials submitted

with their applications and the posted job description. Ms. Herrera scored 116, Mr. Tenorio

scored 84, and Mrs. Tafoya scored 68. *See* Def. MSJ Ex. A at 10-12. The names of these three

applicants, along with eight others, were then given to a three-member interview panel that

consisted of two deputy wardens from CNMCF and the Quality Assurance Director for the State.

The highest cumulative scores from the panel interviews were Ms. Herrera - 118, Mr. Tenorio -

116, and Mrs. Tafoya - 115. *See id.* at 15-40. But the panel was divided on their top choice for

the job. One panelist equally scored Ms. Herrera and Mr. Tenorio as the top candidates by three

points over Mrs. Tafoya.  Another panelist scored Mrs. Tafoya as the top candidate by one point over Ms. Herrera and by two points over Mr. Tenorio.  The third panelist scored Ms. Herrera as the top pick by one point over Mrs. Tafoya and Mr. Tenorio, who were scored equally.  The panel gave their scores and scoring sheets and notes to Warden Romero, who then conducted a final interview.

Mrs. Tafoya discovered in February 2005 that the third panelist had made a math error in adding up Mr. Tenorio's cumulative score, thereby ostensibly erring in awarding Mr. Tenorio four points more than the panelist meant to award him.  But there is no evidence that Warden Romero was aware of this error, and the error did not affect that panelist's top choice, who was Ms. Herrera.

On August 24, 2004, Warden Romero interviewed the three finalists.  He asked four general questions and rated education, experience, and the overall interview.  During Ms. Herrera's interview, which was the first interview he conducted, he asked her how she "would handle a current quality assurance employee who would be upset if [Ms. Herrera] was to be hired for this position.  Following [Ms. Herrera's] response, he indicated [that] a current employee was going to be 'pissed off.'"  Pl. Resp. to MSJ Ex. Y (Herrera Aff.).

Warden Romero gave Mrs. Tafoya an overall score of 27, Mr. Tenorio an overall score of 35, and Ms. Herrera an overall score of 33.  Warden Romero told Mrs. Tafoya on August 31 that he had chosen Mr. Tenorio for the position, and Mr. Tenorio began his work at CNMCF on September 20, 2004.

Mrs. Tafoya was extremely upset because she did not get the job.  On September 4 she wrote Warden Romero a lengthy letter, which she copied to the new Secretary of the DOC,

apologizing for her initial reaction "and any unprofessionalism" in her behavior on August 31.  Pl.

Resp. to MSJ Ex. G at 1.  She stated that doing her job was "not going to be easy," and that she

did not know how long she would stay at CNMCF.  *Id.*  She stated that Warden Romero had

given her three reasons for not promoting her to the position:  he was "constantly hearing [her]

name in a negative light and did not like it . . . [and] felt [he] needed to bring someone else in,"

that "people were telling him that [she] already had the job and [he] didn't like that," and that he

"did not think [she] was ready for the position."  *Id.*

     In the letter, Mrs. Tafoya vigorously defended her disagreement with Warden Romero's

decision not to promote her.  In response to his justification that he had constantly heard her name

in a negative light since he had taken over as Warden, she claimed that CNMCF employees had

"been trying to slander [her] reputation for years."  *Id.*  She stated that, in every department in

which she had worked at CNMCF, other employees had "tr[ied] to put [her] down," and became

"resentful" of  and "resistant" to her.  *Id.* at 2.  She noted that another employee had made a

formal complaint against her and asked for mediation, but that it had come to nothing.  *Id.*  In

response to Warden Romero's related comment that some of his Deputy Wardens "had a hard

time dealing with" Mrs. Tafoya, she stated that she'd been in a tough position since Warden Lytle

left, with "no support and no direction."  *Id.* at 3.  She stated that the Deputy Wardens were

turning in "crappy" documents and were resisting her attempts to obtain documents she felt were

important to the next ACA audit.  She accused the Deputy Wardens of having "sold [her] out,

and now they are going to expect me to carry them through for this next audit."  *Id.* at 4.

     She expressed her anger at Mr. Tenorio having been chosen for the position and noted

that she had let Warden Romero know that she would not teach Mr. Tenorio anything about ACA

at CNMCF.  She repeated a rumor that Warden Romero had chosen Mr. Tenorio because he was

Warden Romero's "hunting buddy."  *Id.* at 5.  She accused Mr. Tenorio of knowing nothing

about ACA or Quality Assurance, said that "everyone" was "shocked" and could not believe he

had been chosen as QA Manager over her, and also stated that unnamed "people are insinuating

that [Mr. Tenorio] has no credibility."  *Id.*

        She next criticized Warden Romero's secretary as being insubordinate for having failed to

timely turn in ACA documents and stated that this made Warden Romero "lose creditability."  *Id.*

On September 15, Warden Romero talked to Mrs. Tafoya about her letter.  According to Mrs.

Tafoya, he thanked her for her honesty, said he knew she worked hard and kept to herself, told

her he wanted her to get involved in additional projects, and told her that he needed other people

besides her to learn ACA.  Pl. Resp. to MSJ Ex. K, att. 3 at 4.

        When Mr. Tenorio reported for work on September 20, Mrs. Tafoya stated that he "made

it clear" that Mrs. Tafoya was to continue her "duties of Accreditation Manager" and preparing

for the next ACA audit.  *Id.*, att. 2 at 3.  On September 21, he told her that Warden Romero was

going to have him doing a lot of other things besides Quality Assurance, and he did not know

whether he would be preparing the monthly QA reports that Mrs. Tafoya had prepared before his

appointment.  *Id.*, att. 3 at 5.  He asked her to assist him in preparing a presentation for the

Warden because he did not know how to use Power Point.  *Id.*  Mrs. Tafoya felt that she did not

"need someone who is just going to give orders and walk around the compound."  *Id.*  She

believed that everything she did as Accreditation Manager should be shifted to Mr. Tenorio as QA

Manager.

        Two days later, Mrs. Tafoya prepared a letter of complaint to the EEOC, alleging

discrimination in the selection process for QA Manager.  *Id.* at 1.  In this letter, she stated that

Warden Romero also told her he did not promote her because she had no security experience.  *Id.*

at 3.  She asserted that Warden Romero discriminated against her because of her sex because he

appointed a man who was less qualified than she was to be QA Manager.  She accused Mr.

Tenorio of lying when he said he had knowledge and experience in accreditation and

characterized him as being nothing more than a "politician always wheeling and dealing to make a

trade (i.e. hunting permit for a job, etc.)."  *Id.* at 6.

      In her formal Charge of Discrimination filed October 21, Mrs. Tafoya listed three

instances of discrimination:  denial of the promotion, denial of the wage increase between January

2002 and May 2003, and denial of a reimbursement for travel costs in December 2003.  *See* Def.

MSJ Ex. A at 1.  She also alleged that she had been retaliated against after complaining to the

Warden about not being promoted by being "isolated by upper management from operation issues

and briefings related to my job." *Id*.

      Mrs. Tafoya later stated, however, that when Mr. Tenorio was promoted to the QA

Manager's position, she "took it upon [herself] to discontinue attending" a weekly conference call

meeting about quality assurance and accreditation issues.  Pl. Resp. to MSJ Ex. K at 4.  She

conceded that she continued to attend weekly Monday morning meetings for all supervisors, *see*

Def. MSJ Ex. B at 90, and that she had been asked to assist with a walk-through audit at all three

CNMCF units and to attend two conference calls in Mr. Tenorio's absence, Pl. Resp. to MSJ Ex.

K at 4.

      Further, in an October 13 letter Mrs. Tafoya wrote to Warden Romero, Mrs. Tafoya

stated that she told Mr. Tenorio, in response to his comment that he had some things for her to

do, that she had "meetings scheduled for the next month and a half, will be going to Santa Fe to help with policies, and have a lot of work to do in the next year so [Mr. Tenorio] needs to just let me do what I need to do."  Pl. Resp. to MSJ Ex. U at 2.  She then included a detailed "agenda" of what she would be doing "for the next year."  *Id.*  She stated that, while she would like to spend time in the prison compound, because of the changeover in staff and lack of experience, she did not foresee having as much time as she would like and did not want to burn out her staff or herself by putting in overtime.  *Id.*  Warden Romero swore that he had not excluded Mrs. Tafoya from any meetings relevant to her job or refused to discuss work matters with her, *see* Def. MSJ Ex. A at 3, 59, and Ex. F at 3, and Mrs. Tafoya did not specify what "operation issues and briefings" she had been excluded from in her response to that testimony other than to mention that Warden Romero had not included her in a single meeting with his Deputy Wardens and Mr. Tenorio in October in which he was going to discuss "some issues with some of our policies."  *Id.* Ex. B at 90.

      Things had gone rapidly downhill from the time Mr. Tenorio started working at CNMCF. Mrs. Tafoya complained from the start that he was delegating jobs to her and to the ACA clerk that she thought he should be performing.  She felt that the ACA clerk she and Mr. Tenorio had hired was incompetent and unable to properly do her job and suggested that she should be fired or transferred to another department.  She placed management training materials on Mr. Tenorio's desk, telling him that he needed them.  On December 15, 2004, Mrs. Tafoya wrote another letter, accusing Mr. Tenorio of making the staff "at all four corners of the building" "angry and discontent" by allegedly asking them about the activities of the ACA clerk and Mrs. Tafoya.  Pl. Resp. to MSJ Ex. U at 15.  She stated that she would not "feed into the Juvenile

13

unprofessionalism you have involved yourself in by starting and feeding a fire." *Id.*  She then stated that the way he had gone about determining what she was doing was "very unprofessional, contributes to a hostile working environment, and is nowhere in lines with the managerial teachings I've been through." *Id.* at 2.  She copied the letter to Warden Romero.

In response to this letter, Mr. Tenorio prepared a written rebuttal denying that he had been questioning other employees about either her or the ACA clerk's activities.  He filed a formal complaint against Mrs. Tafoya for insubordination and for creating a hostile work environment, and requested an independent investigation.  For a reason that is not explained in the record, the State's independent investigator did not begin to interview witnesses until the following May, 2005, and his report was not completed until November 2005.

According to the investigator's report, the ACA clerk reported that, when Mr. Tenorio started working at CNMCF, Mrs. Tafoya would refuse to give other CNMCF employees forms that Mrs. Tafoya had on her computer for ACA compliance, stating that she was not going to do anything to help Mr. Tenorio.  The clerk stated that Mrs. Tafoya claimed she "drew up" the forms and they were hers, and that since CNMCF gave Mr. Tenorio the QA job, he needed to do it. Def. MSJ Ex. A at 76.  This same clerk reported that Mrs. Tafoya said that Mr. Tenorio was not her boss, and that she was not going to show him anything or tell him anything about what was going on in the ACA accreditation process.  *See id.*  The clerk stated that she witnessed Mrs. Tafoya being rude and disrespectful to, and yelling at, Mr. Tenorio and several of the Deputy Wardens.  The clerk's impression was that Mrs. Tafoya was going to do anything she could to make life miserable for Mr. Tenorio and to cost him his job. *See id.*  at 77.  She stated that, when Mr. Tenorio asked about ACA, Mrs. Tafoya would just be rude to him and refuse to tell him

anything.  Another secretary reported that it was Mrs. Tafoya, and not Mr. Tenorio, who was causing problems in the facility.

As to Mrs. Tafoya's accusations that Mr. Tenorio was making certain staff "angry and discontent" by questioning them about Mrs. Tafoya's and the ACA clerk's activities, after interviewing all of these staff members, the investigator determined that none were angry or discontent and that all denied that Mr. Tenorio had questioned them about activities.  *See id.* at 84, 87.   The investigator ultimately concluded in November 2005 that Mrs. Tafoya was not credible and had behaviors consistent with deception; that she had misled the investigator about who had allegedly complained about Mr. Tenorio's behavior; and that she "has demonstrated actions consistent with harassment and creating a hostile work environment for [Mr.] Tenorio." *Id.*  at 86-88.

In the meantime, in December 2004, the Warden, Mr. Tenorio, and Mrs. Tafoya met to discuss the need for an additional staff member to assist with ACA.  *See* Pl. Resp. to MSJ Ex. U at 8.  Warden Romero temporarily assigned a correctional officer to help Mrs. Tafoya beginning in January, but the officer had to be pulled back into corrections a month and a half later.  *See id.*

 In January 2005, Mr. Tenorio told Mrs. Tafoya that he needed for her to inform him of things the ACA office was doing, referring to meetings that Mrs. Tafoya had with the Warden and a Deputy Warden about how to refer to the various units in the ACA accreditation documents. The meetings were responsive to a directive Mr. Tenorio had given the ACA staff but Mr. Tenorio was not included in the meetings.  Mrs. Tafoya complained to Warden Romero in another letter in which she defended her actions, stating that she had always been given latitude to make decisions on these "small, almost meaningless issues."  Pl. Resp. to MSJ Ex. U at 10.

According to Mrs. Tafoya, when Mr. Tenorio asked Mrs. Tafoya to turn in a master key that she had, she became angry and told him, "when it comes time to do office/desk audits right before the ACA audit, you can conduct them," to which Mr. Tenorio responded, "there you go again, telling me what I'm going to do." *Id.*

Mrs. Tafoya and the ACA clerk clashed over several issues, including how to arrange the clerk's office furniture, whether the office needed a shredder, and where it should be located.  Mr. Tenorio asked Mrs. Tafoya whether she had moved the clerk's furniture.  Mrs. Tafoya went to the ACA office and asked the clerk if there was a problem, but the clerk refused to talk with her about it without Mr. Tenorio's presence, so they went to his office.  *See id.* at 11. When Mr. Tenorio tried to resolve the problem, Mrs. Tafoya stated that he was "nitpicking" and giving her more "ammunition" for her lawsuit, and her voice became so loud that Deputy Warden Pino stepped in.  *Id.*  Mrs. Tafoya then alleged that she was being harassed and was working in a hostile work environment.  *See id.*  According to Mrs. Tafoya, Deputy Warden Pino stated that he thought Mrs. Tafoya should keep her master key and that Mrs. Tafoya did not need to get Mr. Tenorio's approval on every small matter, and he encouraged the parties to cooperate, saying, "if we don't pass this audit there will be consequences."  *Id.* [1]

In February 2005, Warden Romero closed out Mrs. Tafoya's prior employee evaluation

---

[1]     Mrs. Tafoya alleged in her complaint and in the pretrial order that Defendant retaliated against her by "advising her that she is expected to get the Department through an ACA Audit in October 2005 and that if she doesn't there will be consequences."  Complaint at ¶ 31. Defendant challenged this allegation in its brief, contending that Mrs. Tafoya has shown no evidence of any adverse action from this statement.  Def. MSJ at 8.  Mrs. Tafoya does not dispute this contention in her response brief, and I therefore consider the claim to be waived.  But even if she did dispute it, it is clear from Mrs. Tafoya's submitted materials quoted above that Deputy Warden Pino's comment was not directed solely at her and cannot be construed as a threat against her.

and gave her a "successful" rating.  Pl. Resp. to MSJ Ex. K at 10.  Mrs. Tafoya construed the

rating as retaliatory because Warden Lytle had previously rated her as "exceptional."  *See id.*

Mrs. Tafoya wrote another memo to Warden Romero, complaining about Mr. Tenorio's

suggestions on how to audit the files that would be submitted in the ACA audit and explaining

how she was going to proceed.  *See id.* Ex. U at 8-9.

   In March 2005, the ACA clerk formerly complained to Mr. Tenorio about Mrs. Tafoya

creating a hostile work environment for her.  She said that Mrs. Tafoya used an upsetting and

condescending tone of voice, and that she unfairly criticized her for not doing her job correctly

when the clerk had been given very little training.  She said that she did not want to put up with

"the screaming and yelling and badmouthing of Deputy Wardens," and that Mrs. Tafoya showed

"no respect for any official that is above her."  Def. MSJ Ex. A at 69.  That same day, Mrs.

Tafoya wrote a lengthy memo to Warden Romero, complaining about the ACA clerk's poor work

performance and recommending that she be removed from the ACA office.  *See* Pl. Resp. to MSJ

Ex. U at 5-7.  She claimed that, since Mr. Tenorio and the ACA clerk had been hired, the ACA

office "has developed into an unorganized chaotic mess."  *Id.* at 7.  Mrs. Tafoya asked for

additional support staff and copied the letter to the Director of Adult Prisons.

   In early April, Mrs. Tafoya was placed under Warden Romero's supervision instead of

Mr. Tenorio's supervision, apparently to help the ACA process go forward more smoothly.  *See*

Pl. Resp. to MSJ Ex. I at 8.  But Warden Romero evidently forgot about the reassignment, and on

May 19 Mr. Tenorio asked to meet with Mrs. Tafoya to "close out" her employee appraisal so

that she could qualify for annual raises.  *See id.*  Mr. Tenorio gave Mrs. Tafoya a "successful"

rating, which made her eligible for the same wage increase she would have received had she been

given an "exceptional" rating.  Def. MSJ Ex. A at 61.  Mrs. Tafoya was again upset with the

rating, and would not sign the evaluation until she talked with Warden Romero.  She sent Warden

Romero another memo.  *See* Pl. Resp. to MSJ Ex. I at 6.  In response, in June Warden Romero

formally reassigned Mrs. Tafoya to be supervised by Deputy Warden Joe Garcia because Mrs.

Tafoya had not named him as a person discriminating against her.  *See id.*

Warden Romero met with the Deputy Wardens, Mrs. Tafoya, and other staff in July to

address ACA audit issues.  *See* Def. MSJ Ex. A at 60.  In early August, in response to Mrs.

Tafoya's complaint that she needed more staffing, Warden Romero assigned several staff

members to her to use however she felt was necessary, including one full-time staff member.  *See*

*id.* at 59.  He met with her on August 8, and she told him she did not think she would need the

full-time member.  Warden Romero then authorized her to pull in all secretarial and clerk

personnel she needed on an as-needed basis.  *See id.*  He stated that, as a general rule, Mrs.

Tafoya did not need to discuss job-related matters with either him or Mr. Tenorio in order to

perform her job duties, *see id.* at 61, and Mrs. Tafoya never rebutted this fact.

Around mid August, 2005, about six weeks before the October 5 ACA audit was to take

place, it was canceled by the Secretary of the DOC.  Mrs. Tafoya testified that she and Warden

Romero worked together to determine what the Secretary was concerned about, and they agreed

that they could get through the audit sucessfully.  *See* Def. MSJ Ex. B at 46-47, 104.  But around

that same time, Mrs. Tafoya had written a memo to the Secretary, accusing Warden Romero of

violating DOC policy by assigning a state vehicle to Mr. Tenorio.  *See id.* Ex. A at 82.

On November 8, 2005, Mrs. Tenorio filed her second EEOC complaint, alleging that she

had been "required to work in a hostile work environment because of the constant harassment I

am subjected to by Warden Jose Romero and [Mr.] Tenorio; that both men refused to discuss

work-related matters with her; and that employee performance evaluations were not completed in

accordance with policy and actual job performance."  Def. MSJ Ex. A at 48.

Deputy Warden Garcia met with Mrs. Tafoya on November 15 to review an "interim"

performance evaluation that he had completed.  He gave her a "successful" rating.  She then

wrote a lengthy memo to him, challenging the rating, alleging that he had failed to specifically

discuss her performance on various assignments, and accusing him of rating her low because of

the litigation.  Deputy Warden Garcia responded that he evaluated Mrs. Tafoya as "successful"

solely on the basis of her performance and memoranda she prepared.  Def. MSJ Ex. A at 65.  He

stated that he believed he had discussed all the performance issues with her, although she may not

believe he had discussed them enough.  He explained that, of the seven employees he supervised,

only three received exceptional ratings, and that an interim rating may not be the same as a final

rating.  He noted that, since he had begun supervising her in June 2005, he had invited Mrs.

Tafoya to accompany him when he monitored the prison cells and units, but that she had not

taken him up on the offer.  He stated that he was always available to discuss with her any issues

relevant to her work, and that he had not excluded her from any meetings or information or seen

anyone else do so.  He asserted that Mrs. Tafoya had never complained to him that she lacked

sufficient staff or support.  *See id.*

### III.  Analysis

**A.  Failure to promote.**  Defendant concedes that Mrs. Tafoya made a prima facie

showing of discriminatory failure to promote; *i.e.*, that she is a woman who was qualified to be

promoted to QA Manager and that she applied for the job but was not promoted.  *See Kendrick*,

220 F.3d at 1226.   But Defendant gave a valid, nondiscriminatory reason for promoting Mr. Tenorio instead of promoting Mrs. Tafoya:  that Warden Romero believed Mr. Tenorio was more qualified than Mrs. Tafoya for a management position.  Defendant gave examples of undisputed fact to support that Warden Romero's reasoning was valid:  Mr. Tenorio had more management experience in more areas of corrections than did Mrs. Tafoya, plus he had ACA and QA experience, and he was considered to be more qualified than Mrs. Tafoya in both the initial ranking and by at least one other panelist in the second step of the interview process.

 In her response to the motion for summary judgment, Mrs. Tafoya claims that Mr. Tenorio's experience in ACA is not admissible because his affidavit did not affirm the information in the interrogatory responses and, therefore, there's no assurance that his ACA experience is true.  But Mrs. Tafoya misses the point.  Whether Mr. Tenorio actually had all the experience in ACA he claimed to have is not important at this juncture; what is important is what information Warden Romero was given at the interviews that informed his decision on who to promote.  *See Kendrick*, 220 F.3d at 1231.  In his interviews, Mr. Tenorio asserted that, at the Academy, where he had supervised and trained other corrections employees, he "had put in place auditing tools;" that he had been past President of the ACA for New Mexico and became "very involved with the standards;" that he was "experienced in using [auditing] resources" like ACA and NIC; and that his "current job deals daily with Quality Assurance."  Def. MSJ Ex. A at 26, 28.  The Tenth Circuit has held that there is no inference of pretext from comparing applications, unless the disparity is overwhelming, and it has cited cases holding that the "difference in qualifications of applicants must be so apparent as 'to jump off the page and slap us in the face'" to support a finding of pretext.  *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1309 (10th Cir. 2005).

Although Mrs. Tafoya had more ACA experience at CNMCF, Mr. Tenorio apparently also had

ACA and quality assurance experience and she had less management, hearing officer, and general

corrections-department experience.  There is no question that Mrs. Tafoya is technically an

outstanding accreditation manager, but that alone did not make her more qualified to be a QA

manager than Mr. Tenorio.  And the fact that Mrs. Tafoya subjectively believes that her ACA

experience should have trumped Mr. Tenorio's management and ACA experience is not evidence

of pretext.  *See Kelley*, 220 F.3d at 1178.  I conclude, as a matter of law, that the difference in

Mr. Tenorio's and Mrs. Tafoya's qualifications is not sufficient to support a finding of pretext.

   In addition, Mrs. Tafoya concedes that she'd had negative experiences with the Deputy

Wardens at CNMCF and, perhaps unfairly, had experienced ongoing criticism and resistance from

other employees because of her personality and management style.  It was reasonable and

nondiscriminatory for Warden Romero not to promote an employee to a management position

whom he knew had difficulty working with other managers and employees.

   Mrs. Tafoya next asserts that she has raised "an overwhelming amount of disturbing

procedural errors in the job-posting process, scoring system, and the interview process" to

demonstrate that the final promotion decision "could only have been based on the subjective

decision of Warden Romero," which she then characterizes as proof of pretext.  Pl. Br. at 13.  I

disagree.   I find none of the alleged errors particularly disturbing and some of the alleged errors

simply are not errors.

   The error in the job posting that made having a college degree a requirement prejudiced

Mr. Tenorio and Mrs. Tafoya equally, in that it resulted in lower preliminary scores for both, but

it did not ultimately prejudice either one of them because they each still ranked in the top three

and were given job interviews.  This "error" demonstrates nothing having to do with alleged gender discrimination.  *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329-30 (10th Cir. 1999).  The fact that Warden Romero could decide to interview anyone whom he could reasonably justify does not mean that the selection process actually used in this case was totally subjective or that it is evidence of pretext.

Mrs. Tafoya next argues that the fact that Warden Romero did not hire Ms. Herrera, who, she asserts, scored higher than Mr. Tenorio in the first two hiring procedures, is evidence from which a jury could infer that he only wanted to hire a man.  Again, I disagree.  First, Mr. Tenorio was rated equally with Ms. Herrera by one of the three panel interviewers.  Second, the record indicates that Ms. Herrera had less correctional department and management experience than Mr. Tenorio; that she had no "operational knowledge of a multi-level facility," Def. MSJ Ex. C at 10; and that she had no experience in being a hearing officer or in supervising them, which was a major aspect of the QA job.  And third, much of Ms. Herrera's experience was in juvenile corrections instead of adult corrections.  "When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria."  *Simms*, 165 F.3d at 1330 (internal quotation marks omitted).  Further, it was clear from his comments that, had Warden Romero not promoted Mr. Tenorio, he would have hired Ms. Herrera, who had both greater experience in ACA accreditation and more education than Mrs. Tafoya, and who did not have a negative reputation at CNMCF.  Thus, Mrs. Tafoya cannot establish that she would have been promoted but for unlawful gender discrimination.  *See Harbison v. Goldschmidt*, 693 F.2d 115, 117 (10th Cir. 1982) (concluding that the Title VII

statutes require a "but for" determination before retroactive promotion and back pay can be ordered).

Mrs. Tafoya asserts that Defendant's reason for promoting Mr. Tenorio instead of her is pretextual because Warden Romero's question about how Ms. Herrera would handle a disgruntled employee, together with his comment that "a current employee was going to be 'pissed off'" when she did not get the job, Pl. Resp. to MSJ Ex. Y, establishes that Warden Romero had preselected Mr. Tenorio and that his decision was not based on the final interview. While this comment may show that, by the final interview, Warden Romero had determined that he would not promote Mrs. Tafoya, it does not demonstrate that he had preselected Mr. Tenorio on the basis of a prohibited factor. Indeed, it demonstrates that Warden Romero was still considering a female for the job and desired to know what management skills she would use should she be hired for the position.

Mrs. Tafoya also contends that asking this question violated DOC policy that requires that all candidates be asked the same basic questions, indicating pretext. But it is clearly obvious why Warden Romero would not ask Mrs. Tafoya that question, and the question was relevant to the general management-style questions he posed. *See Simms*, 165 F.2d at 1330. Pretext can not be inferred from the failure to ask Mrs. Tafoya the same question.

Mrs. Tafoya next contends that pretext may be inferred because Defendant did not follow hiring policies requiring the Defendant to give preference to "in house" applicants and claiming that she was the only in-house applicant of the top three. Pl. Br. at 15. But the record shows that the policy referred to by Mrs. Tafoya defines an "In-House Applicant" as a person employed by the Corrections Department. Mr. Tenorio was therefore also an "in-house applicant" and entitled

23

to the same preference as Mrs. Tafoya.

Asserting that Warden Romero had told her on one occasion that "not even he understands what duties [she] perform[s] in the position" Pl. Resp. to MSJ Ex. A ¶ 17, and that he had encouraged her to apply for a Deputy Warden position, Mrs. Tafoya next contends that he could not have objectively evaluated the candidates when he promoted Mr. Tenorio, which is a procedural irregularity demonstrating pretext. Again, I disagree. Not fully understanding all the duties an employee performs and believing that an employee has some promotion potential but is not the most qualified applicant for a particular position does not mean that a supervisor cannot objectively evaluate candidates for a management position.

Mrs. Tafoya next argues that Warden Romero violated policy because he allegedly did not have Mr. Tenorio's resume at the time he conducted Mr. Tenorio's interview, demonstrating a procedural irregularity. She bases this on a letter from the interview panel that attached only her and Ms. Herrera's resumes and the fact that Warden Romero's interview notes erroneously state that Mr. Tenorio was a UNM graduate. Again, Mrs. Tafoya's contention is without merit. First, as Defendant points out, the policies require only that *candidates bring* "an updated state application with them to the interview." Pl. Resp. to MSJ Ex. N at 3. There is no evidence that Mr. Tenorio did not take such an application to the interview. Further, although Warden Romero may have misstated in one place in his scoring-sheet notes that Mr. Tenorio was a UNM graduate, on the same scoring sheet he actually gave Mr. Tenorio a lower score for education than Ms. Herrera, who did have a college degree, and he gave Mr. Tenorio the same education score as

24

Mrs. Tafoya, who also did not have a degree.[2]  Thus, there is no evidence of procedural irregularity on this basis.

Next, Mrs. Tafoya characterizes as a procedural irregularity indicating pretext her claim that Warden Romero did not keep his original notes from the interview.   But she points to no DOC policy requiring him to do so, and Warden Romero did summarize his notes to indicate the answers he received to questions.  This is not evidence of pretext.

Mrs. Tafoya contends that, after Mr. Tenorio was promoted, (1) she was improperly left to fulfill the duties of QA Manager, allegedly without the assistance of Mr. Tenorio, and (2) Warden Romero asked her to help train Mr. Tenorio on aspects of ACA at CNMCF.  This, she claims, shows that Mr. Tenorio was not more qualified than she was and that his promotion was pretextual.  *See* Pl. Br. at 16.  Her first claim is not supported by the record, and even it was, it would not be evidence of pretext.  First, the QA Manager job description provides that, whoever was promoted to the position of QA Manager, an Accreditation Manager and an ACA clerk would remain as CNMCF employees and were expected to continue to perform the technical tasks of managing the accreditation process.  Second, Mrs. Tafoya testified that she turned over the QA Report process to Mr. Tenorio, as well as the supervision of all ACA employees and hearing officers.  In fact, one basis of her claim of adverse employment action is that these duties were "taken" from her.  Thus, her testimony conflicts with her contention that she was left to fulfill all the duties of the QA Manager without Mr. Tenorio's assistance.  And third, the fact that Mr. Tenorio needed training to understand the specific ACA process being undertaken at

---

[2]    There is no evidence in the record to support Mrs. Tafoya's contention that she has more credit hours of college education than Mr. Tenorio.

CNMCF is not evidence that he was unqualified to be the QA Manager.  Mrs. Tafoya's

contention that she made a showing of pretext on this basis is without merit.

Finally, Mrs. Tafoya again focuses on what she perceives as her "obviously" superior

experience in ACA and QA, contending there were more than "just minor differences" in her and

Mr. Tenorio's qualifications for the position.  Again, Mrs. Tafoya's subjective opinion about what

attributes are most important in a management position is not at issue here.  Mr. Tenorio

objectively had spent more years in the DOC and other corrections agencies, had hearing officer

experience, and also had extensive budget and policy experience and much more management

experience than Mrs. Tafoya.  He was familiar with ACA standards and had some experience in

audits and quality assurance.  The Tenth Circuit has instructed that I must proceed with caution

when considering the relative merits of individual employees, and that I may not "act as a super

personnel department that second guesses employers' business judgments." *Simms*, 165 F.3d at

1330 (internal quotation marks omitted).

I conclude that Mrs. Tafoya has not shown sufficient evidence of pretext to get to a jury

on the issue of whether she was not promoted because of gender discrimination.

**B.  Retaliation.**  Mrs. Tafoya alleges that the retaliation related to her filing the first

EEOC complaint consisted of Warden Romero and Mr. Tenorio isolating her from operation

issues and briefings related to her job; by giving her lower evaluations without valid justifications

than she had received in prior years by different supervisors; and by creating a hostile work

environment for her by harassing her, accusing her of creating a hostile work environment, and

filing a complaint against her.

The affidavits and the record demonstrate that Mrs. Tafoya has failed to establish a

genuine material issue of fact regarding alleged isolation from operation issues and briefings.

Warden Romero and Deputy Warden Garcia both testified that Mrs. Tafoya had not been

excluded from any meetings or briefings essential to her job.  In response, Mrs. Tafoya alluded to

only one incident in which the Warden met with Mr. Tenorio and the Deputy Wardens about

policy issues but did not invite her.  She failed to claim, however, that this meeting was critical to

the performance of her job or that she did not receive information discussed in this meeting

through the normal communication channel of her supervisor, Mr. Tenorio.  The record, Mrs.

Tafoya's testimony, and her numerous letters demonstrate that she was having regular

conversations about her job with both the Warden and with Mr. Tenorio; that she voluntarily

withdrew from attending certain meetings; and that she essentially told the Warden and Mr.

Tenorio that she needed to be left alone to do her job and that she had created an agenda designed

to satisfy her duties as ACA accreditation manager.  Mrs. Tafoya asserts that she was ready for

the ACA audit in October, demonstrating that any alleged deficiencies in communications or

attending meetings did not substantially detrimentally affect her job performance.  The

independent investigation indicated that it was Mrs. Tafoya who refused to communicate with Mr.

Tenorio, not the other way around.  Mrs. Tafoya never filed an internal complaint requesting

investigation into alleged discriminatory or harassing practices, even though she was fully aware

of the existence of the process.  Although she claims that she reported harassment from Mr.

Tenorio to Warden Romero, the only evidence of such alleged harassment is the December 13

letter in which she accused Mr. Tenorio of trying to turn other employees against her, and the

investigator found those claims to be without any merit.  Thus, Mrs. Tafoya's claim that no one

has ever investigated her claim that Mr. Tenorio was pitting other employees against her, *see* Pl.

Br. at 9, is belied by the record.  In short, on the record before me, no reasonable jury could conclude that the Warden or Mr. Tenorio purposefully excluded her from meetings related to her job, refused to communicate with her, or harassed her.  "[M]ere passive treatment does not constitute an adverse employment action."  *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005).

I also conclude that being given a "successful" job evaluation rating under the circumstances in this case is not an adverse employment action sufficient to establish a prima facie case of retaliation.  The undisputed facts showed that (1) different supervisors evaluated Mrs. Tafoya's performance; (2) Mrs. Tafoya was having run-ins with, and yelling at, Deputy Wardens, her supervisor, and other employees; (3) Warden Romero, Mr. Tenorio, and Deputy Warden Garcia were aware of Mrs. Tafoya's refusal to work with Mr. Tenorio and her difficulty in getting along with other managers; and (4) the 2005 ACA audit at CNMCF was cancelled, while the audit she assisted in conducting three years before was very successful.  Under these facts,  I reject Mrs. Tafoya's claim that receiving "successful" job evaluations, some of which resulted in a pay increase for her (and did not result in any adverse action), is evidence of retaliation. "[S]imply because an employee receives an evaluation lower than previous evaluations, the lower evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim." *Stover*, 382 F.3d at 1075; *see Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994) (holding that satisfactory performance evaluation, although lower than previous evaluations, was not an adverse employment action where the employee could not show that evaluation rating was negative and had "presented no evidence of adverse action relating to her evaluation.").

Mrs. Tafoya implies that Mr. Tenorio's filing of his complaint regarding Mrs. Tafoya's alleged insubordination and creation of a hostile work environment constitutes evidence not only of retaliation but of a hostile work environment.  Again, I disagree.

> To survive summary judgment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  [The plaintiff] must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her gender, race, or national origin.

*Sandoval*, 388 F.3d at 1326-27 (internal quotation marks and citation omitted).   "To evaluate whether a working environment is sufficiently hostile or abusive," I must

> examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance.  In addition, the environment must be both subjectively and objectively hostile or abusive.

*MacKenzie*, 414 F.3d. at 1280 (citation omitted).  Here, the independent investigator, after conducting extensive interviews with many employees, concluded that Mrs. Tafoya was in fact guilty of creating a hostile work environment by making false claims against Mr. Tenorio.  Therefore, as a matter of law, Mr. Tenorio's complaints were not frivolous or baseless, and the fact that he used proper channels to complain about her behavior does not make the act retaliatory or the work environment hostile.

I conclude that Mrs. Tafoya has failed to make a prima facie showing of retaliation because she has presented insufficient evidence from which a jury could find an adverse employment action.  I also conclude that there is insufficient evidence of a hostile work

environment to get to a jury.

### C.  Contract/discrimination claims related to failure to pay increase in wages.

Defendant argues that Mrs. Tafoya's claim for temporary and permanent wage increases must fail as having been brought beyond the two-year statute of limitations provided in NMSA § 37-1-23(B).  Def. MSJ at 26.  Mrs. Tafoya has not rebutted this contention.  I conclude that the contract claims for wage increases must be dismissed as untimely filed.

Insofar as she claims that failure to give her the increases are themselves discrete acts of gender discrimination, Defendant contends that they must be dismissed for failure to file an EEOC charge within 300 days of their occurrence.  Again, Mrs. Tafoya has not rebutted this contention. I conclude that I have no jurisdiction to review claims for discrimination based upon the failure to pay the wage increases because Mrs. Tafoya failed to exhaust her administrative remedies.  *See Annett*, 371 F.3d at 1238.

### D.  Contract claims for failure to reimburse lost travel expenses.

Mrs. Tafoya claimed that Defendant breached its contract with her to reimburse her "for plane tickets that she was directed to purchase to attend a work-related conference."  Pretrial Order at 5.  Mrs. Tafoya contended that,

> on December 2, 2003, Assistant Business Manager Shirley Toers-bijns instructed me to purchase an airline ticket to attend the National ACA Conference in New Orleans in January 2004 and told me I would be reimbursed.  On December 17, 2003, after I had already purchased the tickets with my own money, Business Manager Renee Galvan told me the trip was denied by our Central Office.

Pl. Resp. to MSJ Ex. A ¶ 9.  An e-mail sent December 1, 2003, from Frances Page, the Secretary of the DOC's assistant, asked Shirley Dotson (apparently the same person as Shirley Toers-bijns)

to send her a "listing of all your people who will be attending the ACA Conference" so that she could "submit these forms to the Secretary by December 3."  Pl. Resp. to MSJ Ex. V.  On Thursday, December 4, Dotson  received an email from Page noting the "travel *request*" for Mrs. Tafoya to attend the conference.  In the email, Page warned that "there are not sufficient funds" for the whole travel request, that funds would either have to be transferred from other areas or the trip would have to be canceled, and that the "budget is tight," so "this will have to be a management decision at CNMCF and whether this request is a priority."  *Id.*  Page stated that she would hold the travel request until a decision had been made.  *Id.*

Based on Dotson's statements on December 2, 2003, Mrs. Tafoya purchased two "non-refundable, non-transferable" airline tickets for $563.40 for herself and her husband.  Pl. Resp. to MSJ Ex. K ¶ 10.  When the DOC denied the travel request later in December 2003, she "automatically lost $100 per ticket for cancellation, and [would] lose the remainder balance on January 10, 2005" *id.* Ex. K att. 2 at 2, if she did not apply the balance to another ticket by then.  Mrs. Tafoya makes no claim that she did not apply the balance to another ticket.  Thus, Mrs. Tafoya's actual loss allegedly attributable to Dotson's statements was only $100 because Mrs. Tafoya does  not contend that Dotson instructed her to also purchase a ticket for her husband.

Defendant maintains that the State cannot be bound by oral contracts under NMSA § 37-1-23(A) ("Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract"), and for that reason it must be granted summary judgment.  Mrs. Tafoya does not respond to this assertion in her response brief.  I conclude that Mrs. Tafoya's claim for $100 is barred by sovereign immunity because Mrs. Tafoya relied on an oral promise and not on a written contract.  Even if it was not barred by immunity, Mrs. Tafoya

31

has not claimed that Dotson instructed her to purchase a non-transferrable, non-refundable ticket in a situation in which the travel request had not yet been formally approved.  That decision appears to have been wholly Mrs. Tafoya's.

**E.  Contract claims for alleged breach of policies and regulations.**   Mrs. Tafoya alleged breach of contract based upon Defendant's failure to fully abide by certain state personnel rules, DOC policies and procedures, and CNMCF policies.  Defendant asserts that these claims must fail because "there are no damages flowing from any of these alleged breaches."  Def. MSJ at 25-26.  Mrs. Tafoya does not rebut this contention.   I conclude that Mrs. Tafoya's contract claims for alleged breaches of rules, procedures, and policies must be dismissed for failure to show damages arising from the alleged breaches.  *See Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1196 (N.M. 1995) (noting that a plaintiff's burden of proof in an action for breach of contract must prove the existence of a contract, the breach thereof, causation, and damages).  Mrs. Tafoya was not promoted not because the State or  Defendant failed to follow the policies, but because Warden Romero believed that Mr. Tenorio was better qualified for a management position in QA.

## IV.  Conclusion

In summary, I conclude that Mrs. Tafoya has (1) failed to present sufficient evidence from which a jury could find that Defendant's reasons for not promoting Mrs. Tafoya were pretextual and (2) failed to present sufficient evidence of a hostile work environment and/or retaliation, and that Defendant is entitled to summary judgment on these claims as a matter of law.  In addition, I conclude that (3) her contract claims for failure to grant wage increases and reimburse lost travel costs must be dismissed either as untimely filed or as barred by sovereign immunity.  Further, (4)

Defendant is entitled to summary judgment on Mrs. Tafoya's claims for alleged breach of policies, rules, or procedures for failure to point to damages arising from those alleged breaches[3].

Accordingly, I will enter judgment in favor of Defendants.

**NOW, THEREFORE,** Defendant's Motion for Summary Judgment [Docket No.18, filed January 23, 2006] is **GRANTED**.

Dated this 7th day of June, 2006.

**IT IS SO ORDERED.**

_____
**MARTHA VÁZQUEZ**
**CHIEF UNITED STATES DISTRICT JUDGE**

*Attorney for Plaintiff:*

Laura J. Ramos, Esq.
1005 Marquette NW
Albuquerque, NM 87102

*Attorneys for Defendant:*

Long, Pound, & Komer
P.O. Box 5098
Santa Fe, NM 87502-5098

---

[3]    Even if Mrs. Tafoya could point to damages, it seems as a matter of law that general hiring policies, procedures, and rules for advertising, interviewing, scoring, and filling open positions are not valid "written contracts" as that term is used in NMSA § 37-1-23 such that the State's sovereign immunity would be waived. *See, e.g., Cockrell v. Board of Regents*, 45 P.3d 876, 885-87 (N.M. 2002) (noting that claims for violation of federal statute were not breach of contract claims and that the statutes were not valid "written contracts" under NMSA § 32-1-23 for purposes of waiving sovereign immunity).